UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:

LOUISIANA HIGHWAY ST. GABRIEL, LLC, ET AL.[1]          CASE NO. 20-10824
     DEBTORS          CHAPTER 11
          JOINTLY ADMINISTERED

LOUISIANA HIGHWAY ST. GABRIEL, LLC
ALABAMA HIGHWAY BRIDGEPORT, LLC
GRANGE ROAD PORT WENTWORTH, LLC
INDUSTRIAL PARK BOULEVARD WARNER ROBBINS, LLC
RANGE LINE ROAD MOBILE, LLC
SIOUX FALLS, LLC
     PLAINTIFS

VERSUS          ADV. NO. 21-1007

LVS II SPE I, LLC
B2 FIE VII, LLC
B2 FIE VIII, LLC
U.S. BANK NATIONAL ASSOCIATION
     DEFENDANTS

**MEMORANDUM OPINION**

     This adversary proceeding challenges the validity of encumbrances on the real estate of

several related entities that mortgaged property to secure their common parent's debt.

     Plaintiffs[2] Alabama Highway Bridgeport, LLC; Grange Road Port Wentworth, LLC;

Industrial Park Boulevard Warner Robbins, LLC; Range Line Road Mobile, LLC; and Sioux

---

[1]  The debtors in these jointly administered cases are Louisiana Highway St. Gabriel, LLC (Case No. 20-10824); Alabama Highway Bridgeport, LLC (Case No. 20-10825); Grange Road Port Wentworth, LLC (Case No. 20-10826); Industrial Park Boulevard Warner Robbins, LLC (Case No. 20-10827); Range Line Road Mobile, LLC (Case No. 20-10828); and Sioux Falls, LLC (Case No. 20-10829).

[2]  The plaintiffs—collectively, "the debtors"—are single asset real estate projects.  For reasons not relevant to this opinion, Louisiana Highway St. Gabriel, LLC, did not join the motion for summary judgment [P-96].  This opinion resolves the parties' confusing use of different terms for the plaintiffs by referring to each by the name of its locale: Alabama Highway Bridgeport, LLC ("Bridgeport"); Grange Road Port Wentworth, LLC ("Port Wentworth");

Falls, LLC, seek summary judgment on their complaint for declaratory judgment against defendants[3] LVS II SPE I LLC, B2 FIE VII LLC, B2 FIE VIII LLC and U.S. Bank National Association.  They contend that

1. the defendants' mortgages encumbering the debtors' properties are invalid because the loan for which the properties were mortgaged was satisfied in 2016; and

2. even if the debt was not satisfied, the mortgages encumbering the Port Wentworth, Warner Robbins and Sioux Falls properties are invalid because the person who signed the mortgage documents lacked the authority to do so.[4]

In response, defendants LVS, FIE VII and FIE VIII, joined by U.S. Bank,[5] moved for summary judgment.[6]  The Lender Interests seek dismissal of the complaint, arguing that

1. the debtors agreed to pledge their property as security for a 2016 loan and are now equitably estopped from claiming that the mortgages are invalid;

2. the original mortgage on the Sioux Falls, South Dakota property remains effective under South Dakota law as a collateral real estate mortgage;

---

Industrial Park Boulevard Warner Robbins, LLC ("Warner Robbins"); Range Line Road Mobile, LLC ("Mobile"); and Sioux Falls, LLC ("Sioux Falls").

[3] This opinion refers to the defendants individually as LVS II SPE I LLC ("LVS"), B2 FIE VII LLC ("FIE VII"), B2 FIE VIII LLC ("FIE VIII") and U.S. Bank National Association (U.S. Bank").  Collectively they are denominated "the Lender Interests."

[4] The debtors' Motion for Summary Judgment, P-96.  Should the debtors succeed in invalidating the Lender Interests' mortgages, the debtors' property will be unencumbered.  Thus the benefit would inure to the few unsecured creditors and the debtors' parent company.  The debtors have not sought to avoid the mortgages under 11 U.S.C. § 544, and a ruling on summary judgment does not preclude their doing so.

[5] U.S. Bank's joinder, P-100.

[6] LVS's, FIE VII's and FIE VIII's Motion for Summary Judgment, P-98.

3.   the original mortgages on the properties in Mobile and Bridgeport, Alabama, remain effective because they include clauses making the property collateral for future advances by the lender;

4.   the mortgages encumbering real estate in Port Wentworth, Georgia; Warner Robbins, Georgia; and Sioux Falls, South Dakota, are valid because the person signing the mortgage documents had the apparent authority to do so; and finally,

5.   although the debtors sought to reserve for trial their claim that the mortgages and mortgage modifications unjustly enriched the Lender Interests, the Lender Interests contend that as a matter of law the debtors are not entitled to that relief.

## I.    UNDISPUTED FACTS[7]

This dispute stems from dealings between and among the Lender Interests and entities owned and controlled by R. Mark Bostick, majority owner of Commercial Warehousing, Inc. ("CWI"),[8] the sole member of each debtor.[9]

CWI and the R. Mark Bostick Family Trust ("the Bostick Trust") owned Comcar Industries, Inc. ("Comcar"),[10] a transportation business that borrowed $55,000,000 in 2014 (the "2014 Credit Agreement") using the debtors' real estate as collateral for the loan, though the

---

[7]  *See* the debtors' and the Lender Interests' Statements of Uncontested Facts attached to their motions for summary judgment, P-96 and 98, and the debtors' and the Lender Interests' Responses to those statements, P-108 and 110.

[8]  The debtors' Response to the Lender Interests' Statement of Uncontested Facts, P-108-4, ¶ 2.

[9]  The debtors' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-96, ¶¶ 3-8; the Lender Interests' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-98, ¶ 2.

[10]  The debtors' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-96, ¶ 9; the Lender Interests' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-98, ¶ 2.

debtors were not parties to the credit agreement.[11]  The debtors' mortgages named U.S. Bank, the

lenders' collateral agent, as mortgagee.[12]

When Comcar later found itself unable to repay the loan, its owners—the Bostick Trust

and CWI—agreed[13] to exchange Comcar's outstanding debt for a 90% equity interest in

Comcar.[14]  As part of the transaction, R. Mark Bostick obtained an option to repurchase the

Comcar stock for $40,000,000 and payment of Comcar's then-outstanding debt ("Stockholder

Agreement").[15]  As part of the several transactions associated with the Exchange Agreement, the

successors to the original lender, Comcar and U.S. Bank (who then owned 90% of Comcar

stock) entered into an amended agreement ("2016 Credit Agreement")[16] allowing Comcar to

borrow an additional $16,550,000.

Before the parties signed that agreement, however, PIMCO BRAVO Fund II, L.P.

("Bravo II"), the parent of the companies that held the $55,000,000 Comcar debt, notified CWI,

the debtors' parent, by email that existing mortgages on the debtors' properties would remain in

---

[11]  Exhibit A to the debtors' Motion for Summary Judgment, P-96; Exhibit 2 to the Lender Interests' Motion for Summary Judgment, P-98.  *See also* the debtors' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-96, ¶ 10; the Lender Interests' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-98, ¶ 3.

[12]  The debtors' 2014 mortgages are Exhibits B-F to Plaintiffs' MSJ, P-96; Exhibits 3-7 to Defendants' MSJ, P-98.  *See also* the debtors' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-96, ¶ 10-11; the Lender Interests' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-98, ¶¶ 4-5.  LVS later assigned its rights under the 2014 Credit Agreement to an affiliate, FIE VII.  The debtors' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-96, ¶ 13; the Lender Interests' Statements of Uncontested Facts attached to their Motion for Summary Judgment, P-98, ¶ 5.

[13]  The debtors' Statement of Uncontested Facts, ¶ 14; the Lender Interests' Statement of Uncontested Facts, ¶ 13.

[14]  November 16, 2016 Exchange Agreement (the "Exchange Agreement"), Exhibit G to the debtors' Motion for Summary Judgment, P-96; Exhibit 19 to the Lender Interests' Motion for Summary Judgment, P-98.

[15]  Stockholder Agreement, Exhibit 22 to the Lender Interests' Motion for Summary Judgment, P-98.  Bostick did not repurchase the Comcar stock afterward for reasons that are not relevant to this opinion.

[16]  Second Amended and Restated Credit Agreement, Exhibit 20 to the Lender Interests' Motion for Summary Judgment, P-98; Exhibit H to the debtors' Motion for Summary Judgment, P-96.

effect as security for Comcar's obligations as revised by the 2016 Credit Agreement.[17]  After

protesting loudly and early in the case that they never understood that their property was to

continue as collateral for their parent's debt to the Lender Interests,[18] the debtors now concede

the opposite: indeed, their response to the Lender Interests' statement of facts admits that "Bravo

II notified CWI that the parties would keep all of the existing collateral, including the mortgages,

in place."[19]

The 2016 Credit Agreement imposed some additional requirements on the borrowers and

their affiliates in exchange for the additional loans.[20]

The validity of these mortgage modifications lies at the heart of this lawsuit.  When the

2016 Exchange and Credit Agreements were signed, Robert Fox was Comcar's chief financial

officer but also served as an officer and director of CWI, the sole member of each debtor.  Fox

signed his resignation on January 3, 2017, but it was effective November 23, 2016.[21]  Debtors do

not challenge Fox's signatures on the Exchange Agreement (on behalf of Comcar and CWI) and

the 2016 Credit Agreement (on behalf of Comcar).  But his later signatures on the mortgage

modifications and other documents for Port Wentworth, Warner Robbins and Sioux Falls would

seem to be of doubtful validity because before signing those documents, Fox had resigned his

---

[17]  Email dated September 7, 2016 from Bravo II's counsel to CWI's counsel, the debtors' Response to the Lender Interests' Statement of Uncontested Facts, P-108-4, ¶ 7.

[18]  *See* the debtors' opposition to the Lender Interests' motion to dismiss, P-40, ¶ 21.

[19]  Email dated September 7, 2016 from Bravo II's counsel to CWI's counsel, the debtors' Response to the Lender Interests' Statement of Uncontested Facts, P-108-4, ¶ 7.

[20]  Schedule 5.15, entitled "Post-Closing Obligations," required that the "Loan Parties" deliver mortgage modifications to the lenders and collateral agent within 90 days.  P. FIE000020636 of the 2016 Credit Agreement, Exhibit 20 to the Lender Interests' Motion for Summary Judgment, P-98; Exhibit H to the debtors' Motion for Summary Judgment, P-96.

[21]  *Id.*

positions with CWI, its affiliates and subsidiaries, including his positions as the debtors' officer and director.[22]

For reasons that the summary judgment evidence did not make plain, on February 9, 2017, *after* Fox's resignation, a paralegal at Straughn & Turner P.A., the law firm that represented these debtors and CWI, transmitted to a title company responsible for recording the mortgages—with copies to attorneys at Latham & Watkins, LLP, the Lender Interests' counsel[23]—loan certificates, authorizing resolutions and incumbency certificates purporting to authorize Fox to sign mortgage modifications for Port Wentworth, Warner Robbins and Sioux Falls.[24]  So it was that on February 14, 2017, nearly three months after the effective date of Fox's resignation as the debtors' director and officer, he signed mortgage modifications as manager of Port Wentworth, Warner Robbins and Sioux Falls.[25]

The Lender Interests decided, based on advice of their counsel, that mortgage modifications were not necessary for the two Alabama properties—Mobile and Bridgeport— because those mortgages' future advance clauses would secure the new lending.[26]

The Lender Interests obtained a mortgage modification from Sioux Falls but now contend alternatively that the original collateral real estate mortgage secures the debt even if the modification is ruled invalid.

---

[22]  Fox Resignation, Exhibit L to the debtors' Motion for Summary Judgment, P-96; Exhibit 24 to the Lender Interests' Motion for Summary Judgment, P-98.

[23]  *Id.*

[24]  February 9, 2017 emails, Exhibits 29 and 30 to the Lender Interests' Motion for Summary Judgment, P-98.

[25]  Port Wentworth, Warner Robbins and Sioux Falls mortgage modifications, Exhibits 34, 35, 36 to the Lender Interests' Motion for Summary Judgment, P-98; Exhibits I, K, J to the debtors' Motion for Summary Judgment, P-96.

[26]  The Lender Interests' Statement of Uncontested Facts, P-98-1, ¶ 26.

## II.   SUMMARY JUDGMENT STANDARD

Fed. R. Bankr. P. 7056 incorporates Fed. R. Civ. P. 56 making summary judgment proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[27]

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts…. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"[28]

## III.   ANALYSIS

The parties dispute three principal issues:

1.  the continuing validity of mortgages affecting the debtors' properties in the wake of the 2016 Exchange and Credit Agreements;

2.  the validity of mortgage modifications bearing on the Port Wentworth, Warner Robbins and Sioux Falls properties that Robert Fox executed after the effective date of his resignation; and

3.  whether the mortgages should be invalidated as having unjustly enriched the lenders.

### A.  Unjust Enrichment

Though the debtors sought to reserve for trial their claim that the mortgages and other security devices unjustly enriched the Lender Interests, the defendants have moved for summary

---

[27] Fed. R. Civ. P. 56(a) and (c); *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (*en banc*).

[28] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-7 (1986) (quoting F.R.C.P. 56(e)).

judgment dismissing those claims as a matter of law, forcing the debtors to address the issue in advance of trial.

The debtors' amended complaint[29] alleges that the Lender Interests obstructed R. Mark Bostick from being able to exercise his option under the Stockholder Agreement to repurchase the Comcar stock, so the mortgages should not be enforced against the debtors' property because doing so would unjustly enrich the Lender Interests at the debtors' expense.  But the parties' agreements themselves, which elect Florida law, bar this theory.

> Under Florida law, which the parties chose to govern the Stockholder Agreement a claim for unjust enrichment is an equitable claim based on a legal fiction which implies a contract as a matter of law even though the parties to such an implied contract never indicated by deed or word that an agreement existed between them. *Tooltrend, Inc. v. CMT Utensili, SRL,* 198 F.3d 802, 805 (11th. Cir.1999).  Such a contract implied in law, also known as a quasi-contract, is established "where it is deemed unjust for one party to have received a benefit without having to pay compensation for it."  *Id.; see Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co.,* 695 So.2d 383 (Fla. 4th DCA 1997)(en banc). … When a true contract exists, the parties' rights are fixed by law and by the terms of the contract.  However, when an implied or quasi-contract is involved, liability is determined by principles of equity and justice and the intent of the parties is immaterial.[30]

But these parties have entered into agreements—mortgages and mortgage modifications—and those agreements preclude the debtors' resort to the equitable remedy of unjust enrichment.

Because the doctrine of unjust enrichment is inapplicable, the debtors' argument that a genuine issue of material fact exists as to one element of unjust enrichment—"whether there is relation between the enrichment and impoverishment"[31]—need not be reached.

---

[29]  Amended Complaint, P-75,

[30]  *14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc.,* 43 So.3d 877, 880 (Fla. Dist. Ct. App. 2010).

[31]  The debtor's Objection to the Lender Interests' Motion for Summary Judgment, P-108, p. 17.

### B. The 2016 Exchange and Credit Agreements' Effect on the Original Mortgages

The Exchange Agreement[32] in section 2.06, entitled "Termination of Exchanged Loans;

Release of Liens," provides:

> Upon the Closing Date, the Term Lender [defined as FIE VII] agrees that all obligations of the Loan Parties to the Lender under the Credit Agreement [defined as the 2014 Credit Agreement] and the other Loan Documents … including principal, accrued and unpaid interest, premium, costs, expenses and fees, shall be paid in full and all commitments of the Term Lender under the Loan Documents shall be terminated.

The same day as the Exchange Agreement, the parties entered into the 2016 Credit Agreement,[33]

which provides in section 2.01(a):

> Upon consummation of the Exchanges pursuant to the terms of the Exchange Agreement, (x) each of the Original Term Loan, New Loans and First Out Loans shall have been exchanged for Equity Interests in the Company on the Amendment and Restatement Effective Date, (y) such Original Term Loan, New Loans, and First Out Loans shall no longer be outstanding and (z) the Existing Lender shall no longer be a Lender hereunder.

Thus, the language of the 2016 Exchange and Credit Agreements terminated the debt under the

2014 Credit Agreement and presumably ended the effectiveness of those mortgages.  But the

mortgages are governed by laws of the states where the debtors' properties are located,[34] so their

continued validity is governed by the situs states' laws.

### C. Bridgeport and Mobile

The debtors maintain that the Bridgeport and Mobile mortgages were extinguished in

2014 when the Lender Interests received equity in Comcar in exchange for satisfaction of its

---

[32] Exchange Agreement, Exhibit G to the debtors' Motion for Summary Judgment, P-96; Exhibit 19 to the Lender Interests' Motion for Summary Judgment, P-98.

[33] 2016 Credit Agreement, Exhibit 20 to the Lender Interests' Motion for Summary Judgment, P-98; Exhibit H to the debtors' Motion for Summary Judgment, P-96.

[34] 2014 Mortgages, Exhibits 3-7 to the Lender Interests' Motion for Summary Judgment, P-98.

debt.  The Lender Interests counter that the mortgages remain effective because each includes a future advance clause.

The Bridgeport and Mobile mortgages elect application of Alabama law.[35]  Alabama Code § 7-9A-204 provides:

> Future Advances; Obligations Secured. Under subsection (c) collateral may secure future as well as past or present advances if the security agreement so provides. This is in line with the policy of this Article toward security interests in after-acquired property under subsection (a). Indeed, the parties are free to agree that a security interest secures any obligation whatsoever. Determining the obligations secured by collateral is solely a matter of construing the parties' agreement under applicable law. …

The Bridgeport and Mobile mortgages include identical future advance clauses:

> Future Advances.  This Mortgage is given to secure not only existing indebtedness, but also future advances, whether such advances are obligatory or are to be made at the option of Mortgagee, or otherwise, as are made within (20) years from the date hereof, to the same extent as if such future advances are made on the date of the execution of this Mortgage.  The total amount of indebtedness that may be so secured may decrease to a zero amount from time to time, or may increase from time to time, but the total unpaid balance so secured at one time may not exceed two (2) times the aggregate amount of the Indebtedness, plus interest thereon, and any disbursements  made for the payment of taxes, levies or insurance on the Mortgaged Property, with interest on such disbursements at the Default Rate as hereinafter defined.[36]

As the Alabama Supreme Court observed in *Cottingham v. Citizens Bank:*[37]

> "The law in Alabama is clear that a mortgage for a specific debt cannot be used to secure any subsequent advances in the absence of an express provision securing future indebtedness." *Johnson v. Shirley,* 539 So.2d 165, 168 (Ala.1988).  See also *First State Bank of Franklin County v. Ford,* 484 So.2d 407, 408 (Ala.1986); *Cooper v. Elba Exchange Bank,* 496 So.2d 41, 43 (Ala.1986).  "Alabama case law holds that future advance clauses are valid to extend 'the security to other existing indebtedness or to future indebtedness between the same parties.'" *Ex parte*

---

[35]  2014 Mobile and Bridgeport Mortgages, Exhibits 6 and 7, p. 9 of the Lender Interests' Motion for Summary Judgment, P-98.

[36]  Bridgeport and Mobile Mortgages, p. 9 of Exhibits 6 and 7 to the Lender Interests' Motion for Summary Judgment, P-98.

[37]  *Cottingham v. Citizens Bank*, 859 So.2d 414 (Ala. 2003).

*Chandler,* 477 So.2d 360, 362 (Ala.1985) (quoting *Underwood v. Jarvis,* 358
So.2d 731, 733 (Ala.1978); *First Nat'l Bank of Guntersville v. Bain,* 237 Ala. 580,
582, 188 So. 64, 66 (1939)).[38]

The debtors contend that the mortgages do not fulfil the *Cottingham* court's requirement
that the future indebtedness be between the same parties.  They offer two reasons: 1) Bridgeport
and Mobile are not parties to either credit agreement; and 2) the lender in the 2014 Credit
Agreement was FIE VII (LVS's assignee) but the lender in the 2016 Credit Agreement is FIE
VIII.

That Bridgeport and Mobile are not parties to the credit agreements is irrelevant.  The
debtors point to no authority supporting their position or interpretation of the statute that
mortgagors must be parties to the related note or credit agreement.  Comcar is the borrower in
both the 2014 and 2016 credit agreements.  Bridgeport and Mobile executed mortgages of their
properties to secure Comcar's indebtedness and Comcar's future indebtedness.

The debtors next contend that the lenders in the agreements are not identical.  The parties
to the 2014 Credit Agreement were Comcar as the borrower, LVS as lender, and U.S. Bank as
disbursing and collateral agent.[39]  The debtors do not dispute that FIE VII became the lender by
assignment from LVS.

In the 2016 Credit Agreement, just as in the 2014 Credit Agreement, Comcar was the
borrower and U.S. Bank was the disbursing and collateral agent.[40]  Though FIE VII is included

---

[38] *Id.* at 419.

[39] 2014 Credit Agreement, Exhibit 2 to the Lender Interests' Motion for Summary Judgment, P-98.

[40] 2016 Credit Agreement, Exhibit 20 to the Lender Interests' Motion for Summary Judgment, P-98.

as a lender in the 2016 Credit Agreement, an additional lender, FIE VIII, is also included.[41]  The

2016 Credit Agreement defined "Lenders":

> "Lenders" means (i) the Existing Lender: provided that upon the effectiveness of
> this Agreement and the consummation of the Exchanges on the Amendment and
> Restatement Effective Date, the Existing Lender shall no longer be a Lender, (ii)
> *the Persons listed on the Commitment Schedule* and (iii) any other Person that
> shall have become a party hereto pursuant to an Assignment and Assumption,
> other than any such Person that ceases to be a party hereto pursuant to an
> Assignment and Assumption.[42]

FIE VII is named as the "Existing Lender"[43] and signed in that capacity.[44]  In addition to the

"Existing Lender," the definition of "Lenders" in the 2016 Credit Agreement includes "Persons

listed on the Commitment Schedule."[45]  FIE VIII is listed on the Commitment Schedule under

the heading "Lenders,"[46] and FIE VIII signed the 2016 Credit Agreement as "a Lender."[47]

    The Eleventh Circuit considered Alabama law's requirement that a mortgage securing

future advances be between the same parties in *In re Yelverton*.[48]  Gladys Yelverton opened an

account in her name and signed a line of credit agreement with Army Aviation.  Several months

later she signed another loan agreement with Army Aviation adding Clifton and Elijah Yelverton

as joint borrowers.  The later agreement incorporated the earlier agreement but also included a

---

[41] *Id.*

[42] *Id.* at 13 [emphasis supplied].

[43] *Id.* at 1.

[44] *Id.* at FIE000020578.

[45] *Id.* at 13.

[46] *Id.* at FIE000020581.

[47] *Id.* at FIE000020579.

[48] *Army Aviation Center Federal Credit Union v. Yelverton (In re Yelverton)*, 298 F. App'x. 941 (11th Cir. 2008).

future advance clause.  Gladys, Clifton and Elijah later borrowed funds to purchase a vehicle under the second agreement before Gladys and Elijah filed bankruptcy in 2006.

The court of appeals reversed the lower courts' ruling that the two agreements were not between the same parties, reasoning that "multiple agreements can be 'between the same parties' when only one of the parties signs all the agreements."[49]

Here, FIE VII is the lender in the 2014 Credit Agreement and *Lenders* in the 2016 Credit Agreement includes FIE VII and its affiliate FIE VIII.  Considering *Yelverton*, this satisfies the requirement that the agreement be "between the same parties."

The debtors dispute this, pointing to an email chain regarding advice of Alabama counsel dated February 9, 2017, between Kyle DeThomas of Latham and Watkins, the Lender Interests' counsel, and Simona Rosen of KV National, the title company.[50]  DeThomas asks Rosen:

> Simona – with our AL local counsel finally on board, the advice we are now getting is that we don't necessarily need to record modifications in Alabama (since no specific/material terms are being modified).  Would it be possible to get a date down endorsement for these properties without recording modifications?[51]

Rosen responds:

> Without the recorded modification agreements we are unable to issue the modification endorsements. we *[sic]* can issue a date down endorsement instead.[52]

The debtors argue that the advice of the Lender Interests' local counsel was based on the 2016 Credit Agreement having no specific or material modifications.  But the 2016 Credit

---

[49]  *Id.* at 946.

[50]  Email dated February 9, 2017, pp. FIE000030368-69 of Exhibit 28 to the Lender Interests' Motion for Summary Judgment, P-98.

[51]  *Id.*

[52]  *Id.*

Agreement does include specific and material modifications: specifically, a new lender. However, their argument fails. First, it takes the email out of context, failing as it does to specify whether it refers to terms of the 2016 Credit Agreement. And second, the debtors cite no Alabama authority requiring that the original loan and future advance loan have identical terms.

The debtors cite *Martin v. First Nat. Bank of Opelika*[53] for the Alabama Supreme Court's pronouncement that "[w]hether execution of a new note was an extension or payment of the old note is a matter of intention of the parties." They argue that because Mobile and Bridgeport were not parties to the 2016 Credit Agreement and did not execute mortgage modifications, the Lender Interests have not shown that Mobile and Bridgeport intended for their mortgages to extend to the 2016 Credit Agreement.

The debtors misinterpret *Martin*. Colie and Hughie Martin mortgaged their property in 1956 as collateral for a $2,000 loan, due one year from execution. The mortgage included a clause extending the mortgage to future advances made before the $2,000 loan was paid in full. Before the note was due, the Martins made a payment to principal and executed a renewal note for the balance, payable in one year. The Martins executed a second renewal note before the first was paid. Before the second renewal note matured, Mr. Martin alone signed a new note: Mrs. Martin was not a signatory. Mr. Martin signed a renewal note before the note was paid but died before paying that note.

Mrs. Martin argued that the mortgage did not secure the renewal note that her husband alone had signed. The Alabama Supreme Court disagreed, pointing to mortgage language reciting that as to all terms, including *mortgagors*, "[t]he singular included the plural, and the

---

[53] *Martin v. First Nat. Bank of Opelika*, 184 So.2d 815, 821 (Ala. 1966) (citations omitted).

plural the singular."[54]  It held that because Mrs. Martin had signed the mortgage including the future advance clause, the mortgage was valid even though only one of the couple had signed the new promissory note.[55]

Alabama cases such as *Martin* discussing future advance clauses consider the intent of the parties in executing the mortgage, and not their intent at the time of the future advance, as the debtors suggest. [56]  Lack of Bridgeport's and Mobile's express intent at the time of the 2016 Agreement that their mortgages would act as security is irrelevant, just as in *Martin,* where Mrs. Martin did not express intent for the mortgage to secure to the new note her deceased husband had signed.

To summarize, the debtors signed mortgages that secured Comcar's indebtedness to FIE VII (as transferee from LVS) with U.S. Bank as collateral and disbursing agent.  Those mortgages include future advance clauses and so the real estate secures Comcar's future indebtedness to the same lender.  The 2016 Credit Agreement is a loan between the same parties because Comcar is the borrower, FIE VII is included as a lender and U.S. Bank is the disbursing and collateral agent.  Thus, the Bridgepoint and Mobile mortgages secure the future advances made pursuant to the 2016 Credit Agreement.

### D.  Sioux Falls

The debtors argue that the Exchange Agreement extinguished the Sioux Falls mortgage because Comcar's debt to FIE VII was exchanged for a ninety percent ownership interest in

---

[54]  *Id*. at 820.

[55]  *Id*. at 821-22.

[56]  *In re Bennett*, 60 B.R. 48, 51 (Bankr. N.D. Ala. 1985) (citing *First Nat'l Bank v. Cotton*, 164 So. 371 (Ala. 1935); *Malkove v. First Nat. Bank of Mobile*, 326 So.2d 108, 195 (Ala. 1976)).  *See also Crescent Credit Corp. v. Union Bank & Trust Co. of Montgomery,* 288 So.2d 744, 746 (Ala. Civ. App. 1974).

Comcar.  The Lender Interests counter that the Sioux Falls mortgage was not extinguished

because it is a valid collateral real estate mortgage under South Dakota law.  Alternatively, the

Lender Interests argue that the mortgage modification Fox executed on behalf of Sioux Falls

cannot be contested because Fox had the apparent authority to sign on Sioux Falls' behalf.

### 1.  Collateral Real Estate Mortgage

The Lender Interests argue that the Sioux Falls mortgage remains valid under South

Dakota law.  South Dakota Codified Laws § 44-3-8 states:

> Whenever any mortgage, pledge, or other lien of any kind has been satisfied
> either by payment, foreclosure, or other legal means, the holder of such lien shall,
> within thirty days of satisfaction, deliver a sworn satisfaction to the debtor.

However, South Dakota Codified Laws § 44-8-26 provides:

> A mortgage which contains the following statement in printed or typed capital letters:
> THE PARTIES AGREE THAT THIS MORTGAGE CONSTITUTES A COLLATERAL
> REAL ESTATE MORTGAGE PURSUANT TO SDCL 44-8-26, is subject to the
> provisions of this section.  A mortgage executed pursuant to this section shall be entitled
> in printed or typed capital letters: MORTGAGE--COLLATERAL REAL ESTATE
> MORTGAGE. A mortgage made pursuant to this section shall, notwithstanding the fact
> that from time to time during the term thereof no indebtedness is due from the mortgagor
> to the mortgagee, constitute a continuing lien against the real property covered thereby
> for the amount stated in the mortgage.  Any sums not exceeding the face amount of the
> mortgage, together with interest thereon as provided in the instrument secured by the
> mortgage, advanced by the mortgagee prior to or during the term of the mortgage have a
> lien priority as of the date the mortgage was filed.  At any time the indebtedness due the
> mortgagee is zero, the mortgagor may demand in writing that the mortgage be satisfied,
> and the mortgagee shall within ten days thereafter execute and record a satisfaction
> thereof.  Collateral real estate mortgages may be used to secure commercial, agricultural
> or consumer loans or lines of credit including, but not limited to, revolving notes and
> credits and over-draft checking plans.
>
> A filed collateral real estate mortgage is effective for a period of five years from the date
> of filing and thereafter for a period of sixty days.  No sums advanced subsequent to the
> end of the sixty-day period, save and except sums advanced for protection of the real
> estate collateral and for real property taxes or insurance, are secured by the collateral real
> estate mortgage unless an addendum to the collateral real estate mortgage extending its
> effective date is filed prior to the end of the sixty-day period.  An addendum continuing
> the effectiveness of the collateral real estate mortgage may be filed by the mortgagee
> within six months before and sixty days after the expiration of the five-year effective
> date.

An addendum to a collateral real estate mortgage for the sole purpose of continuing the effectiveness of its lien need be signed only by the mortgagee. Upon the timely filing of such an addendum to a collateral real estate mortgage, the effectiveness of the collateral real estate mortgage will be continued for five years and sixty days after the addendum filing date.  Thereafter, the addendum shall lose effectiveness to secure sums advanced after the sixty day period to the extent as provided above, unless another addendum to the collateral real estate mortgage continuing the effectiveness of its lien is filed prior to the end of the sixty day period.  Succeeding addendums to collateral real estate mortgages may be filed in the same manner to continue the effectiveness of the lien of the collateral real estate mortgage.

A collateral real estate mortgage or similar device enables a lender to retain collateral without redocumenting the loan and obtaining a new mortgage if the debt has been reduced or satisfied.[57]  Its flexibility simplifies continued commercial financing.  Thus, if the Sioux Falls mortgage is a collateral real estate mortgage under South Dakota law, it secures future advances and the 2016 loan.

The parties agree that the original mortgage on the Sioux Falls property includes the language the statute requires.  Despite that, the debtors argue that the mortgage does not comply with other provisions in the South Dakota law because 1) the "amount stated" and "face amount" of the mortgage cannot be identified; and 2) the mortgagee, defined in the mortgage as U.S. Bank, did not advance the funds but was merely the collateral agent and not the lender.

### a.  First issue: The Amount of the Sioux Falls Mortgage Debt

The Sioux Falls mortgage recites on p. 2 that the mortgage debt is "not to be in excess of $110,000,000."[58]  The mortgage also provides on p. 9, in a section titled "Future Advances," that:

---

[57] "A collateral real estate mortgage enables a lender to file one mortgage with a stated face amount while the actual debt owed during the term of the mortgage may fluctuate based on the credit needs of the borrower."  *In re Roth*, 171 B.R. 357, n. 1 (Bankr. D.S.D.1994) (citing *Gust v. Peoples and Enderlin State Bank*, 447 N.W.2d 914, 917 (N.D.1989); S.D.C.L. § 44–8–26).

[58]  2014 Sioux Falls Mortgage, Exhibit 5 to the Lender Interests' Motion for Summary Judgment, P-98.

> The total amount of indebtedness that may be so secured may decrease to zero from time to time, or may increase from time to time, but the total unpaid balance so secured at one time may not exceed two (2) times the aggregate amount of the Indebtedness…"[59]

The debtors have not established any ambiguity regarding the amount of the mortgage debt: it was not to exceed $110,000,000, twice the $55,000,000 Comcar borrowed in 2014 for which the Sioux Falls property was mortgaged.

### b.  Second issue: The Sioux Falls Mortgagee

The debtors also contend that U.S. Bank did not advance the funds as South Dakota Codified Laws § 44-8-26 requires and was merely the collateral agent rather than the lender.  But the mortgage on p. 19 identifies U.S. Bank as agent and attorney-in-fact for the lenders.[60]

Under South Dakota Codified Laws § 59-3-1,

> Every act which may legally be done by or to any person, may be done by or to the agent of such person for that purpose unless a contrary intention plainly appears.

The lenders gave U.S. Bank authority to act in their place, making it the mortgagee for all purposes under the statute.  Nothing in the statute or the authorities the parties have cited suggests South Dakota law requires more.  The debtors' citation to the South Dakota Supreme Court's opinion in *Stabler v. First State Bank of Roscoe*[61] is distinguishable.  The original *Stabler* mortgagee signed a mortgage addendum despite previously having assigned its interests to a new mortgagee; and no evidence established that the original mortgagee was acting as agent for the

---

[59] *Id.*

[60] *Id.*

[61] *Stabler v. First State Bank of Roscoe*, 865 N.W.2d 466 (S.D. 2015).

new mortgagee.[62]  In contrast, the lenders named U.S. Bank their agent and gave it their authority to act as the mortgagee.

In conclusion, the Sioux Falls mortgage is a valid collateral real estate mortgage that extends to future advances under South Dakota Codified Laws § 44-8-26.  As a result, the Sioux Falls mortgage modification was unnecessary.  The Lender Interests' alternative argument, that the Sioux Falls mortgage modification is valid due to apparent authority, is moot.

### E.  Apparent Authority—Port Wentworth and Warner Robbins

When Comcar exchanged its debt to FIE VII for 90% of Comcar's equity, the Lender Interests required modifications of the mortgages on Port Wentworth and Warner Robbins. Robert Fox as a result signed mortgage modifications on their behalf on February 14, 2017,[63] despite having resigned as the debtors' officer and director on January 3, 2017 (with an effective date of November 23, 2016).[64]

The debtors contend that the Port Wentworth and Warner Robbins mortgage modifications are not valid because Robert Fox lacked the authority to sign those documents on the debtors' behalf after he resigned as the debtors' officer and director.  The Lender Interests respond that Fox possessed apparent authority to sign those documents, and as a result the debtors cannot now contest the validity of those two debtors' mortgage modifications.

---

[62] *Id.* at 481.

[63] Port Wentworth and Warner Robbins Modifications, Exhibits 34, 35 to the Lender Interests' Motion for Summary Judgment, P-98.

[64] Fox Resignation, Exhibit L to the debtors' Motion for Summary Judgment, P-96; Exhibit 24 to the Lender Interests' Motion for Summary Judgment, P-98.

Port Wentworth and Warner Robbins were organized under Delaware law and the debtors and the Lender Interests both applied Delaware agency law in their analysis of Fox's apparent authority to execute the modifications.[65]

In *Vichi v. Koninklijke Philips Electronics, N.V.*,[66] the chancery court addressed the concept of apparent authority:

> Apparent authority … "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  In other words, "apparent authority is such power as a principal holds his [a]gent out as possessing or permits him to exercise under such circumstances as to preclude a denial of its existence."  Importantly, "[i]n dealing with the agent the third person must act with 'ordinary prudence and reasonable diligence' in ascertaining the scope of the agent's authority" and "he will not be permitted to claim protection if he ignores facts illustrating the agent's lack of authority."[67]

The Lender Interests' argument rests principally on the role played by the debtors' long-time law firm in handling documents relating to the transactions.  Specifically, Deborah Quattlebaum, the senior real estate paralegal[68] at Straughn & Turner P.A., the law firm that had represented the debtors and CWI as general counsel since September 2000,[69] sent to KV National, a title company, loan certificates, authorizing resolutions and incumbency certificates in connection with the challenged transactions.  Those documents purported to authorize Fox to

---

[65] *See Bobbie Chance Robinson & Commercial Grain Marketing, LLC (In re Smith)*, 582 B.R. 417, 421 (Bankr. N.D. Miss. 2017), holding that "[t]he law of the state in which the business entity is organized applies to determine whether an action is filed with proper corporate authority."

[66] *Vichi v. Koninklijke Philips Electronics, N.V.*, 85 A.3d 725 (Del. Ch. 2014).

[67] *Vichi*, 85 A.3d at 799 (citations omitted).

[68] Straughn deposition February 1, 2021, p. 16, Exhibit 1 to the Lender Interests' Motion for Summary Judgment, P-98.

[69] Straughn deposition February 1, 2021, pp. 17-18, Exhibit 1 to the Lender Interests' Motion for Summary Judgment, P-98.

sign the modifications for Port Wentworth and Warner Robbins.  The paralegal sent the same documents to the Lender Interests' counsel, Latham & Watkins.

The debtors contest the reasonableness of the Lender Interests' reliance on the paralegal's role.  They claim that the Lender Interests knew Fox had resigned as an officer of CWI and the debtors, and therefore, the Lender Interests could not reasonably have relied on the documents the paralegal sent as evidence of Fox's apparent authority to act for the debtors.  They point to Fox's February 12, 2017 email to three recipients at Bravo II, the lenders' parent company, as evidence that the Lender Interests should have known that Fox lacked authority to sign the mortgage modifications.[70]  The email establishes that Fox had been acting as an interim officer for Comcar (by then owned 90% by FIE VII) since the Exchange Agreement was signed in November 2016 and touted his performance in that role.  The email includes Fox's claim that he "[c]ontinued to defend Comcar from repeated attempts by CWI to avoid payments owed by presenting detailed analyses, explanation and factual financial support."[71]  Fox also represented in the email that he had "continued to display firm, unwavering support and 100% loyalty to [Bravo II] since the transaction closed."[72]

The debtors argue that Fox's profession of his loyalty to the Lender Interests' parent and his efforts to collect from the debtors' parent company, CWI, betrayed his lack of authority to act for the debtors and belie the Lender Interests' claim to have reasonably relied on Fox's apparent authority to act for the debtors.

---

[70]  Exhibit C to the Declaration of Richard Straughn, which is Exhibit B to the debtors' Objection to the Lender Interests' motion, P-108.

[71]  *Id.*

[72]  *Id.*

The debtors also point to an email sent by the Lender Interests' counsel, Richard Straughn of Latham & Watkins, asking another law firm, Scopelitis, Garvin, Light, Hanson & Feary, P.C. ("Scopelitis"), to give corporate opinions on the debtors' executing mortgage modifications because Straughn was not going to deliver them. [73]   The email provides:

> in addition to local counsel opinions, we need "corporate" opinions for each of the mortgagors (all delaware entities), confirming due existence, authority, authorization, execution—the usual stuff. that opinion last time around came from two counsels to the borrower: straughn handled for all of the mortgagors with property in florida, and scudder handled for the balance of the mortgagors. now that neither of those firms represent any of the borrowers, they won't be delivering those opinions …[74]

The Lender Interests counter that they were not informed of Fox's resignation as the debtors' manager,[75] so when Ms. Quattlebaum sent the documents to their lawyers and the title company, it was reasonable for the Lender Interests to rely on that as an indication that Fox did indeed have the authority to act for the debtors.

"Questions of apparent authority are questions of fact."[76]  Both the debtors and Lender Interests present evidence that creates a genuine issue of material fact precluding summary judgment on either motion.  The United States Supreme Court held in *Anderson v. Liberty Lobby, Inc.,*[77]

> courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. …  a "judge's function" at summary judgment is not "to

---

[73] Exhibit G to Exhibit B to the debtors' Objection to the Lender Interests' Motion for Summary Judgment, P-108.

[74] *Id.* at Plaintiffs_016511.

[75] Fox had been the debtors' manager but hadn't advised the Lender Interests that he had resigned that position.  Fox deposition dated April 21, 2022, p. 172, Exhibit 25 to the Lender Interests' Motion for Summary Judgment, P-98. Nor did Straughn, the debtors' general counsel, advise the Lender Interests, Bravo II or the title company that Fox had resigned.  Straughn deposition dated March 29, 2022, p. 123, Exhibit 8 to the Lender Interests' Motion for Summary Judgment, P-98.

[76] *Billops v. Magness Constr. Co.*, 391 A.2d 196, 199 (Del. 1978).

[77] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505 (1986).

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[78]

Because there is a genuine issue of material fact regarding the reasonableness of the Lender Interests' reliance on Fox's authority to sign the mortgage modifications, summary judgment on the issue is denied.

### F. Equitable Estoppel

The Lender Interests maintain that the debtors agreed to pledge their property as collateral for the 2016 Credit Agreement so equitable estoppel precludes them from claiming that the mortgages are invalid. The debtors counter that the Lender Interests waived the affirmative defense of equitable estoppel by not including it in their answer to the complaint and instead asserting it for the first time on summary judgment.

### 1. The Lender Interests Did Not Waive Equitable Estoppel

The Lender Interests maintain that the defense did not arise until the March 29, 2022 deposition of Richard Straughn, the debtors' pre-bankruptcy counsel. At the beginning of the chapter 11 cases, the debtors contended that they did not agree that their mortgages would secure the 2016 Credit Agreement.[79] Then Straughn admitted in his March 29, 2022 deposition[80] that the parties had agreed that the debtors' properties would secure the 2016 Credit Agreement, and that they would execute mortgage modifications if necessary.[81] Straughn's admission is the basis for the Lender Interests' affirmative defense of equitable estoppel.

---

[78]  *Id*. at 249.  *See also Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014)).

[79]  Amended Complaint, P-75, ¶ 53.

[80]  Straughn's deposition March 29, 2022, Exhibit 8 to the Lender Interests' Motion for Summary Judgment, P-98.

[81]  *Id*. at p. 70, ll.10-25; p. 77, l. 17 – p. 79, l. 3.  Straughn initially took the position that the debtors had not agreed that their properties would secure the 2016 Credit Agreement.  *See* ¶ 53 of the Amended Complaint signed by

The Fifth Circuit held in *Pasco ex rel. Pasco v. Knoblauch*[82]:

An affirmative defense is not waived if the defendant "raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond."[83]

Straughn, in his March 29, 2022 deposition, only admitted the facts supporting the plea after the Lender Interests had answered the amended complaint.[84]  The Lender Interests urged the affirmative defense of equitable estoppel in their Motion for Summary Judgment just five weeks after Straughn's admission, "a pragmatically sufficient time."[85]  The facts do not support debtors' claim to have been prejudiced in their ability to respond to the Lender Interests' motion.[86]

## 2.   Equitable Estoppel Analysis

The Lender Interests maintain that Florida law on equitable estoppel is applicable because that is "where the representations were made."[87]  The debtors contend that Delaware law applies because the debtors are organized under Delaware law.[88]  The elements of equitable estoppel are similar under both states' laws.

Under Florida law, the elements of equitable estoppel are:

(1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position

---

Straughn and Straughn's deposition February 1, 2021, Exhibit 1 to the Lender Interests' Motion for Summary Judgment, P-98.  Straughn changed his position when shown emails at his deposition referring to the mortgages.

[82]  *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572 (5th Cir. 2009).

[83]  *Id*. at 577 (quoting *Allied Chemical Corp. v. Mackay,* 695 F.2d 854, 855-56 (5th Cir. 1983)).

[84]  Answers filed September 23, 2021 by LVS, FIE VII and FIE VIII [P-78] and by U.S. Bank [P-80].

[85]  *Id.*

[86]  The debtor's Objection to the Lender Interests' Motion for Summary Judgment, P-108, p. 12.

[87]  The Lender Interests' Memorandum in Support of Summary Judgment, P-98-2, p. 11.

[88]  The debtor's Objection to the Lender Interests' Motion for Summary Judgment, P-108, p. 13.

detrimental to the party claiming estoppel, caused by the representation and reliance thereon.[89]

Similarly, Delaware law requires the party asserting equitable estoppel to show that it:

(1) "lacked knowledge of the truth of the facts in question;"

(2) "relied on the conduct of the party against who estoppel is claimed;" and

(3) "suffered a prejudicial change of position as a result of [its] reliance."[90]

The Lender Interests maintain that 1) the debtors' agreement that their properties would serve as collateral for the 2016 Credit Agreement is a material representation; 2) they relied on the debtors' representation in extending a $16,550,000 loan to Comcar in the 2016 Credit Agreement; and 3) the debtors' position now that the Lender Interests have no valid mortgages deprives the defendants of the collateral that was the *quid pro quo* for the $16,550,000 loan.

The debtors contend that the Lender Interests hired their own counsel to give opinions on what was needed to maintain the security interests in debtors' property.  The debtors maintain that it was unreasonable for the Lender Interests to rely on anyone other than the counsel they hired.

Reasonable reliance for equitable estoppel is a question of fact.[91]  As with apparent authority, there is a genuine issue of material fact as to whether it was reasonable for the Lender Interests to rely on the debtors' representation rather than relying on the Lender Interests' own

---

[89] *State v. Harris*, 881 So.2d 1079, 1084 (Fla. 2004) (citing *State Dep't of Revenue v. Anderson,* 403 So.2d 397, 400 (Fla.1981)).

[90] *Bantum v. New Castle Country Vo-Tech Educ. Assoc.,* 21 A.3d 44, 51 (Del. 2011) (quoting *Waggoner v. Laster,* 81 A.2d 1127, 1136 (Del. 1990); *Wilson v. American Ins. Co.,* 209 A.2d 902, 903-04 (Del. 1965)).

[91] *Knaysi v. A. H. Robins Co.,* 679 F.2d 1366, 1370 (11th Cir. 1982); *Pell v. E.I. DuPont De Nemours & Co.,* 231 F.R.D. 186, 189 (D. Del. 2005).

counsel to maintain their mortgages on the debtors' property.  Thus, summary judgment is denied on this issue.

## IV.    CONCLUSION

The debtors' and the Lender Interests' motions for summary judgment are granted in part and denied in part.

The debtors' claim of unjust enrichment is dismissed.

The Bridgepoint and Mobile mortgages secure future advances pursuant to Alabama law.

The Sioux Falls mortgage is a valid collateral real estate mortgage that extends to future advances under South Dakota law.

Summary judgment is denied as to the validity of the mortgage modifications of Port Wentworth and Warner Robbins.  Summary judgment is also denied as to equitable estoppel, which the Lender Interests raised timely and did not waive.

Counsel for the Lender Interests should submit a proposed order.

Baton Rouge, Louisiana, June 27, 2022.

<u>**s/ Douglas D. Dodd**</u>
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE