UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:

LOUISIANA HIGHWAY ST. GABRIEL, LLC, ET AL[1]
    DEBTORS

CASE NO. 20-10824
CHAPTER 11
JOINTLY ADMINISTERED

---

ALABAMA HIGHWAY BRIDGEPORT, LLC,
GRANGE ROAD PORT WENTWORTH, LLC,
INDUSTRIAL PARK BOULEVARD WARNER
ROBBINS, LLC, RANGE LINE ROAD MOBILE, LLC
AND SIOUX FALLS, LLC
    PLAINTIFFS

VERSUS

ADVERSARY NO. 21-1007

LVS II SPE I LLC, B2 FIE VII LLC, B2 FIE VIII LLC
AND U.S. BANK NATIONAL ASSOCIATION
    DEFENDANTS

**MEMORANDUM OPINION**

The plaintiffs seek to invalidate mortgage modifications, and thus the mortgages themselves, held by the defendants LVS II SPE I LLC, B2 FIE VII LLC, and B2 FIE VIII LLC (collectively "Defendants").[2] On summary judgment rendered July 22, 2022, the court dismissed the complaint as to Alabama Highway Bridgeport, LLC, Range Line Road Mobile, LLC, and Sioux Falls, LLC, and ruled that there were genuine issues for trial as to Grange Road Port Wentworth, LLC ("Grange Road") and Industrial Park Boulevard Warner Robbins, LLC ("Industrial Park") (Grange Road and

---

[1] The Debtors in these jointly administered cases are as follows: Louisiana Highway St. Gabriel, LLC (Case No. 20-10824); Alabama Highway Bridgeport, LLC (Case No. 20-10825); Grange Road Port Wentworth, LLC (Case No. 20-10826); Industrial Park Boulevard Warner Robbins, LLC (Case No. 20-10827); Range Line Road Mobile, LLC (Case No. 20-10828); and Sioux Falls, LLC (Case No. 20-10829). The address of the Debtors' headquarters is: 100 Industrial Blvd., Winter Haven, Florida 33880.

[2] U.S. Bank was originally a defendant in this adversary but was dismissed with prejudice pursuant to a stipulation among the parties. P-130.

Industrial Park are collectively referred to as "Plaintiffs").[3] Trial was held on June 27 and 28, 2023. Upon conclusion of the trial, the court afforded the parties 21 days from receipt of the transcripts to file post-trial memoranda, and the parties timely filed memoranda on August 7, 2023.[4] Thereafter, the court took the matter under advisement. The court now renders its ruling.

## Jurisdiction, Venue, and Core Status

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. Venue is proper pursuant to 28 U.S.C. § 1409(a). The matter constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (E), and (K). To the extent any of these issues are non-core in nature, Defendants are deemed to have consented to this court rendering a final judgment.

## Facts

This dispute stems from dealings between the Defendants and entities owned and controlled by R. Mark Bostick, majority owner of Commercial Warehousing, Inc. ("CWI"), which is the sole member of the Plaintiffs.[5]

In 2014, CWI and the R. Mark Bostick Family Trust ("the Bostick Trust") owned Comcar Industries, Inc. ("Comcar"). Comcar borrowed $55,000,000 from B2 FIE VII, LLC ("FIE VII"), a fund managed by Pacific Investment Management Company, LLC ("PIMCO"). Among other collateral, Plaintiffs' real estate in Georgia was pledged as collateral for the loan, though the Plaintiffs were not borrowers, guarantors, or parties to the credit agreement (the "2014 Loan").[6]

---

[3] Judgment, P-122.

[4] Plaintiffs' Post-trial Memorandum, P-168; Defendants' Post-trial Memorandum, P-170.

[5] Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 3.

[6] Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 4.   .

The Plaintiffs executed mortgages naming U.S. Bank, the Defendants' collateral agent, as mortgagee, as contemplated and required by the credit agreement.

Comcar defaulted on the 2014 Loan, and in November 2016, FIE VII agreed to exchange the outstanding debt due it under the 2014 Loan for a 90% equity interest in Comcar and also agreed to extend a new loan to Comcar in the amount of $16,550,000 ("2016 Loan"). The parties agreed that Plaintiffs' properties in Georgia would continue to serve as collateral for the 2016 Loan and that any necessary mortgage modifications would be executed by the Plaintiffs post-closing.[7] The validity of these mortgage modifications lies at the heart of the complaint.

In conjunction with the 2016 Loan, the parties entered into an Amended Credit Agreement ("2016 Credit Agreement") and an Exchange Agreement on November 16, 2016.[8] Robert Fox, who had been the chief financial officer ("CFO") of Comcar and CWI and an officer, director, and manager of the Plaintiffs since 2006,[9] executed the 2016 Credit Agreement[10] and Exchange Agreement[11] on behalf of both Comcar and CWI.

When FIE VII became the 90% owner of Comcar upon execution of the Exchange Agreement on November 16, 2016,[12] Comcar's board, officers, and representation changed. Prior to FIE VII becoming the 90% owner of Comcar, Richard Straughn was a board member and officer (secretary) of Comcar. Mr. Straughn and his firm, Straughn and Turner, PA ("Straughn

---

[7] Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 4.

[8] Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 4.

[9] Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 3.

[10] 2016 Credit Agreement, Exhibit JX044.

[11] Exchange Agreement, Exhibit JX045.

[12] Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 4.

and Turner"), represented Comcar, CWI, and Plaintiffs in connection with the 2014 and 2016 Loans. Straughn and Turner also acted as title agent for the mortgage modifications for real estate of other entities located in Florida in connection with the 2016 Loan.[13] Once FIE VII became the 90% owner of Comcar, Mr. Straughn was removed from the board of Comcar and as an officer. Also, Straughn and Turner was replaced as Comcar's counsel by Scopelitis, Garvin, Light, Hanson & Feary, P.C. ("Scopelitis").

Mr. Straughn and his firm were not the only ones affected by FIE VII becoming Comcar's 90% owner. Mr. Fox became the chief operating officer ("COO") and interim chief executive officer ("CEO") of Comcar;[14] and his roles with CWI and Plaintiffs soon ceased.

On December 27, 2016, the boards of CWI and Plaintiffs signed resolutions removing Mr. Fox as CFO of CWI and as an officer, director, and manager of Plaintiffs.[15] By letter dated January 3, 2017, Mr. Fox resigned his positions with both CWI and Plaintiffs retroactive to November 23, 2016.[16] Mr. Straughn took over as manager of Plaintiffs.[17]

Neither Mr. Straughn nor Mr. Fox told Defendants, their counsel, Latham & Watkins, LLP ("L&W"), or Defendant's manager PIMCO that Mr. Fox resigned his positions with CWI and Plaintiffs or that Plaintiffs' boards had replaced him with Mr. Straughn.[18]

---

[13] Plaintiffs' properties are located in Georgia, and the title agent for Plaintiffs' properties was KV National.

[14] Fox was also a candidate for permanent CEO of Comcar. Testimony of Neumeyer, Tr. T. 101:16-25. *See also* Email from Mr. Fox to Katherine Verner, Chris Neumeyer, and Sean Hinze of PIMCO dated 2/17/17, Exhibit JX084.

[15] Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 4. Exhibit JX051.

[16] Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 4. Exhibit, JX052.

[17] Unanimous Written Consent of the Directors of CWI and Affiliates, Exhibit JX051.

[18] Testimony of Straughn, Tr. T. 254:2-10; Testimony of Neumeyer, Tr. T. 159:2-20; Testimony of Boras, Tr. T. 355:25 – 356:22; Deposition of Fox, Exhibit JX117, 171:14 – 172:7, 184:13-16, 185:22 -186:5.

On February 14, 2017, Grange Road and Industrial Park executed mortgage modifications granting their real property in Georgia as collateral for the 2016 Loan as agreed for consideration of the 2016 Loan.[19]  Mr. Fox signed the mortgage modifications as "Manager" of Grange Road and Industrial Park,[20] though he had resigned as manager effective November 23, 2016, and Mr. Straughn became the manager.  The parties to this lawsuit do not dispute whether Mr. Fox had actual authority to grant the mortgages to secure the 2016 Loan.  He did not.

If successful, Plaintiffs will free up the pledged real property collateral to be sold for the benefit of creditors in this bankruptcy.  Defendants have asserted two defenses to Mr. Fox's lack of actual authority to sign the mortgage modifications: apparent authority and equitable estoppel.

## Apparent Authority

As previously held in the opinion on summary judgment, "the mortgages are governed by laws of the states where the debtors' properties are located, so their continued validity is governed by the situs states' laws"[21] – in this case Georgia.  However, authority for limited liability companies, such as Plaintiffs, to act is governed by the law of the state in which the

---

[19] Modification to Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement and Fixture Filing, Exhibits JX092 and JX093.  It is uncontested that mortgage modifications were necessary under Georgia law for Plaintiffs' properties to secure the 2016 Credit Agreement.  Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 4.

[20] *Id.*

[21] *Louisiana Highway St. Gabriel, LLC v. LVS II SPE I, LLC (In re Louisiana Highway St. Gabriel, LLC)*, No. 20-10824, 2022 WL 2309799, at *5 (Bankr. M.D. La. June 27, 2022).  *See also Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (1979) (" Property interests are created and defined by state law.")

entity is organized.[22] Both Grange Road and Industrial park were organized in Delaware,[23] and therefore, Delaware law on apparent authority controls.

In *Root v. MaidPro Wilmington*,[24] the court found, "The concept of apparent authority focuses not upon the actual relationship of a principal to the agent, but the reasonable perception of the relationship by a third party."[25]

The Delaware Supreme Court held in *Parke Bancorp. Inc. v. 659 Chestnut LLC*[26] that "[a]pparent authority … 'is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'"[27]

In Vichi v. *Koninklijke Philips Elecs., N.V.*,[28] the Delaware Court of Chancery opined:

> In other words, "apparent authority is such power as a principal holds his [a]gent out as possessing or permits him to exercise under such circumstances as to preclude a denial of its existence." Importantly, "[i]n dealing with the agent the third person must act with 'ordinary prudence and reasonable diligence' in ascertaining the scope of the agent's authority" and "he will not be permitted to claim protection if he ignores facts illustrating the agent's lack of authority."[29]

---

[22] *Louisiana Highway St. Gabriel*, 2022 WL 2309799, at *11 (citing *Bobbie Chance Robinson & Commercial Grain Marketing, LLC (In re Smith)*, 582 B.R. 417, 421 (Bankr. N.D. Miss. 2017)). *See also In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 207 (5th Cir. 2018), *as revised* (June 14, 2018) (holding that state law determines who has authority for an entity to file a bankruptcy petition).

[23] Operating Agreement of Grange Road, Exhibit JX001; Operating Agreement of Industrial Park, Exhibit JX002.

[24] *Root v. MaidPro Wilmington*, No. N20C-05-156 CLS, 2023 WL 2194528 (Del. Super. Ct. Feb. 23, 2023).

[25] *Id.* at *3.

[26] *Parke Bancorp. Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 2019 WL 4389027 (Del. 2019).

[27] *Parke Bancorp,* 217 A.3d at 712 (citing *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 799 (Del. Ch. 2014)).

[28] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 799 (Del. Ch. 2014).

[29] *Vichi,* 85 A.3d at 799 (citations omitted).

Based on Delaware law, the questions before the court are 1) whether Grange Road and Industrial Park held out Mr. Fox as having authority to sign the modifications, and 2) whether the Defendants were reasonable in relying on that authority.

### *Did Plaintiffs Hold Out Mr. Fox as Having Authority?*

While the 2016 Credit Agreement was being negotiated and signed, Mr. Fox had been Plaintiffs' managers and CFO of Plaintiffs' sole member, CWI. Defendants and their counsel, L&W, were never informed that Mr. Fox's authority had been terminated. Under Delaware case law, "[o]nce apparent authority has been created, it does not terminate until the third person has reason to know that the principal has revoked the authority."[30]

During the restructuring period, Mr. Fox continued to do some work for CWI pursuant to an Administrative Services Agreement executed by Comcar and CWI that provided that Comcar would provide "administrative, operational, accounting, and financial services" for CWI for a fee.[31] Mr. Fox's testimony[32] about why he signed the mortgage modifications as Plaintiffs' manager was not particularly insightful, as he did not recall why he signed them and could only speculate. When Mr. Fox was questioned about his role with CWI in January 2017, he said:

> A. Well, we continued to work – I mean we worked under that management services agreement all along. The – I guess at some point I had a – the official capacity of what was listed here as financial officer, treasurer, manager potentially, but I was not paid by CWI and just operated under that administrative

---

[30] *Yellow Book USA, LP v. Dearworth*, No. CIV.A. 2000-08-336, 2002 WL 31999361, at *4 (Del. Com. Pl. Oct. 1, 2002) (citing Restatement of Agency, 2d, 125, Comment b). *See also Petition of Mulco Prod., Inc.,* 50 Del. 28, 49, 123 A.2d 95, 106 (Del. Super. Ct.), *aff'd sub nom. Mulco Prod., Inc. v. Black*, 50 Del. 246, 127 A.2d 851 (1956) (finding "the apparent authority of an agent is not restricted by any secret limitations placed upon that agent by his principal unless and until the notice of said limitations is communicated directly or indirectly to third persons dealing with the agent")

[31] Administrative Services Agreement, Exhibit JX103, p. 4. *See also* Deposition of Fox, Exhibit JX117, 312-22.

[32] The parties agreed to introduce excerpts of Mr. Fox's April 21, 2022, deposition as Exhibit JX117 in lieu of live testimony.

services agreement to keep the books and records of the company and certain administrative things.[33]

Later in his deposition, when asked why he signed the mortgage modifications as manager of Plaintiffs, Mr. Fox testified that he was not sure whether he was their manager, but he thought the legal team for Comcar must have believed he was.[34] Mr. Fox was asked about Mr. Straughn's involvement in legal work for Comcar at that time.

> Q.  After the post-restructuring, would Richard [Straughn] have been doing the legal work for Comcar?
>
> A.  I think Richard [Straughn] transitioned out of Comcar where if there were things that he was involved in previously or would have knowledge about, he still remained involved. If it was something that was new to kind of the new board, then that was typically Scopelitis.[35]

Mr. Fox clarified Straughn and Turner's involvement later in his testimony.

> Q.  And I was just trying to clarify. When you said that the Straughn & Turner law firm would be involved with matters related to the transaction, the transaction you're talking about is that November 2016 restructuring; right?
>
> A.  Right. Yeah. Anything related to that would typically be Straughn & Turner or the Scudder firm as we were trying to wrap all that stuff up.[36]

In Mr. Straughn's testimony, he clearly tried to minimize Straughn and Turner's role in Plaintiffs' mortgage modifications. However, emails suggest that Straughn and Turner had an active role. On January 4, 2017, Mr. DeThomas at L&W emailed Simona Rosen at KV National, the title company, that L&W "had a call with the Straughn team today and thought it would be a good idea to get the documents approved by local counsel in front of [the title

---

[33] Deposition of Fox, Exhibit JX117, 31:14-22.

[34] Deposition of Fox, Exhibit JX117, 59-73.

[35] Deposition of Fox, Exhibit JX117, 68:22 – 69: 4.

[36] Deposition of Fox, Exhibit JX117, 162:2-9.

company] as soon as possible."[37]  This email shows that Straughn and Turner, Plaintiffs' counsel, was working with L&W to complete mortgage modifications.

On September 8, 2016, Mr. Straughn asked Kim Boras of L&W, and copied Stacey Rosenberg and Kyle DeThomas of L&W, to include Mr. Straughn's paralegal, Deborah Quattlebaum, "on all real estate emails."[38] Ms. Quattlebaum sent an email that same day to Ms. Rosenberg and Ms. Boras of L&W, as well as Mr. Straughn, asking whether L&W was reaching out to local counsel about the modifications or if L&W wanted Straughn and Turner to do it.[39]  Ms. Rosenberg replied to Ms. Quattlebaum, Mr. Straughn, and Ms. Boras, stating that L&W would appreciate it if Straughn and Turner would reach out.[40]

On February 3, 2017, Mr. DeThomas at L&W sent the title company and Ms. Quattlebaum drafts of modifications with a line for the manager of each Plaintiff to sign, but the manager's name was blank.[41]

Later that day, Mr. DeThomas at L&W sent signature pages to Ms. Quattlebaum at Straughn and Turner, this time with "Robert Fox" listed as manager.  No one at Straughn and Turner, Plaintiffs' counsel, told L&W that Mr. Fox was no longer the manager. Ms. Boras of L&W testified, and the court finds her testimony credible, that L&W's standard practice is always to get managers' names from local counsel.  She also testified that that practice was adhered to in this case,

---

[37] Email 1/04/17, Exhibit JX062, p. 5.

[38] Email 9/08/16, Exhibit JX026, p. 3.

[39] *Id*. at p. 2.

[40] *Id*.

[41] Email 2/03/17, Exhibit JX062, pp. 1, 20, 45.

specifically from Plaintiffs' counsel, Straughn and Turner, because that is who was in the best position to know who had authority to act for Plaintiffs.[42]

Ms. Quattlebaum of Straughn and Turner then sent the package of documents related to the modifications, including the authorizing resolutions, to a paralegal at Comcar, Renee Roop,[43] for Mr. Fox to sign on February 2, 2017.[44]

Ms. Roop testified that she and Mr. Fox:

> had a discussion that he was not the manager of the out-of-state LLCs and he advised that he, he would not sign the documents unless PIMCO or their lawyers had told him to sign them, which they did tell him that according to his conversation to me.[45]

Mr. Fox's testimony revealed that he was not sure who told him to sign the documents, but he believed Comcar's legal team might have. He also testified that Mr. Straughn was still working with Comcar on post-closing matters related to the 2016 Loan.[46]

On February 3, 2017, Ms. Quattlebaum of Straughn and Turner transmitted the documents, including the authorizing resolutions that Mr. Fox signed, to L&W and the title company, KV National.[47] The resolutions of Grange Road and Industrial Park authorizing the mortgage modifications specifically name Straughn and Tuner as having been engaged by the Plaintiffs "in connection with the transactions contemplated by the resolutions."[48]

---

[42] Email 2/03/17, Exhibit JX063, pp. 33-36.

[43] Ms. Roop notarized Mr. Fox's signature on the documents despite knowing he was no longer Plaintiffs' manager. Testimony of Roop, Tr. T. 50:1-4; 53:18 – 55:2.

[44] Email 2/02/17, Exhibit JX076, p. 3.

[45] Testimony of Roop, Tr. T. 50:1-7.

[46] Deposition of Fox, Exhibit JX117, 162:2-9.

[47] Emails dated 2/09/17, Exhibits JX078, JX079, JX080.

[48] Authorizing Resolution of Industrial Park, Exhibit JX078, p. 42; Authorizing Resolution of Grange Road, Exhibit JX079, p. 57.

Based on the testimony and evidence presented, the court finds that Plaintiffs held out Mr. Fox as having authority to execute mortgage modifications for Plaintiffs.

### *Were Defendants Reasonable in Relying on Mr. Fox's Authority?*

Plaintiffs contend that Defendants were not reasonable in relying on that authority because after the 2016 Loan, Mr. Fox continued working for Comcar, who was now 90% owned by FIE VII. Plaintiffs point to an email by Mr. Fox to employees of PIMCO, Defendants' manager, in which Mr. Fox, interim CEO of Comcar, advocated that he be appointed permanent CEO. In that email,[49] Mr. Fox pointed out his efforts to collect debt[50] owed by CWI to Comcar and pledged loyalty to Comcar. Plaintiffs maintain it was unreasonable for Defendants to have believed that Mr. Fox was trying to collect debt from CWI (Plaintiffs' sole member) while working for Comcar under its new majority owner. They also maintain that Mr. Fox's statement of loyalty to Comcar shows he was not loyal to any other company.

Plaintiffs make it seem like there was animosity between Comcar and CWI that would prevent Mr. Fox from working with both companies. Evidence points to the contrary.

Prior to the 2016 Loan, the administrative functions of CWI and Comcar were entwined. During the transition period after the 2016 Loan, Comcar performed administrative services for CWI for a fee. Chris Neumeyer of PIMCO testified that Comcar was in a transition period and that the parties knew it would take time for Comcar and CWI to separate.[51] Mr. Fox testified Comcar and CWI were working together on the transition.

---

[49] Email 2/12/17, Exhibit JX084.

[50] During the transition period after the 2016 Loan, Comcar and CWI entered into an Administrative Services Agreement whereby Comcar performed "administrative, operational, accounting, and financial services" for CWI for a fee. Administrative Services Agreement, JX103, p. 4. *See also* Deposition of Mr. Fox, Exhibit JX117, p. 31, ll. 2-10.

[51] Testimony of Neumeyer, Tr. T. 164:23-24.

> Q. And other than provided administrative services, you had no role with CWI?
>
> A. Well, there was a – a significant transition that was occurring where we were working together. We would meet at least weekly, typically Richard Straughn involved and others with CWI, to try to help them have the financial systems that they were trying to implement … So, you know, that was a significant project between the two companies.[52]

Mr. Fox had, at all times known to Defendants, held positions with both Comcar and CWI. No one informed Defendants, PIMCO, or L&W that Mr. Fox no longer had authority to act for Plaintiffs. In addition, Plaintiff's counsel sent L&W documents showing that Mr. Fox had the authority to sign the modifications.

Plaintiffs also contend that it was the responsibility of Defendants' counsel, L&W, to discover that Mr. Fox no longer had authority to act as Plaintiffs' manager. Defendants' counsel did due diligence by reviewing loan certificates and authorizing resolutions of the Plaintiffs that were sent to them by Plaintiffs' counsel. Neither Plaintiffs' counsel nor Mr. Fox informed them that Mr. Fox no longer had authority. They certainly had every opportunity to do so. Defendants relied on Plaintiffs' counsel, the party in the best position to know who had authority to sign as manager. The court finds this reliance reasonable.

Based on the evidence and testimony presented, the court finds that Defendants reasonably relied on Mr. Fox's apparent authority to sign the mortgage modifications. Accordingly, Plaintiffs are bound by the mortgage modifications.

Though it is unnecessary for the court to address Defendants' other defense, equitable estoppel, the court will do so.

---

[52] Deposition of Fox, Exhibit JX117, 63: 11-23.

**Equitable Estoppel**

Defendants contend that the doctrine of equitable estoppel prevents Plaintiffs from taking the position now that the mortgage modifications are invalid after agreeing that their properties would secure the 2016 Loan. The argument can be boiled down to this: the court should either afford all parties the benefit of their bargain (collateral for the 2016 Loan) or bestow an enormous windfall upon the Plaintiffs pursuant to "gotcha" litigation.[53]

Choice of law is again disputed. Plaintiffs contend that law of Delaware, the state under which they are organized, applies. Defendants contend that Florida law applies because it is where the parties agreed that Plaintiffs' properties would secure the 2016 Loan. As previously held in the opinion on summary judgment,[54] the elements of equitable estoppel are similar under both states' laws.

Under Florida law, the party asserting estoppel must prove the following elements by clear and convincing evidence:[55]

> (1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon.[56]

Similarly, Delaware law requires the party asserting equitable estoppel to show by clear and convincing evidence[57] that:

---

[53] To be clear, the windfall referenced here would be the resulting emancipation of the Plaintiffs' real property from the mortgages at issue should the Plaintiffs prevail in this lawsuit.

[54] *Louisiana Highway St. Gabriel,* 2022 WL 2309799, at *13-14.

[55] *Lovejoy v. Poole*, 230 So.3d 164, 166 (Fla. 5th DCA 2006) (citations omitted).

[56] *State v. Harris*, 881 So.2d 1079, 1084 (Fla. 2004) (citing *State Dep't of Revenue v. Anderson,* 403 So.2d 397, 400 (Fla. 1981)).

[57] *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch.), *aff'd,* 884 A.2d 512 (Del. 2005).

(i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance.[58]

Plaintiffs' response to Defendants' equitable estoppel argument is two-fold: 1) Plaintiff contends that Defendants have not met their strong burden of proof of clear and convincing evidence, and 2) Plaintiffs contend that equitable estoppel cannot prevent it, as a debtor-in-possession, from invalidating the mortgage modifications.

### *Clear and Convincing Evidence*

Both Florida and Delaware jurisprudence indicate that equitable estoppel prevents a party from taking advantage of a defect in a sale or mortgage that the party itself caused or knew of and was in a position to correct.

In *Cox v. La Pota*,[59] the Florida Supreme Court held that a couple was equitably estopped from contesting a sale when they were aware they had not signed the sale contract in the presence of two witnesses as required by Florida law. The court held, "To permit the appellants to take advantage of such a defense under the facts disclosed by this record would permit them to plead their own wrong, which was known to them, as an excuse for non-compliance."[60]

Similarly in *Borders v. Townsend Assocs.*,[61] the Delaware Superior court held that a party to a mortgage "cannot gain an unfair advantage from an irregularity of its own creation."

---

[58] *Nevins*, 885 A.2d at 249 (citations omitted).

[59] *Cox v. La Pota*, 76 So.2d 662 (Fla. 1954).

[60] *Cox*, 76 So.2d at 664.

[61] *Borders v. Townsend Assocs.,* No. CIV.A. 98L12023RFS, 2002 WL 725266, at *5 (Del. Super. Ct. Apr. 17, 2002).

It is undisputed that Plaintiffs agreed that their properties would continue to serve as collateral for the 2016 Loan and that Plaintiff would execute mortgage modifications.[62] The court is not persuaded by Plaintiffs' arguments that Plaintiffs were not parties to the 2016 Credit Agreement. They clearly understood that their collateral was an absolute requirement of the 2016 Loan. As held above, the mortgage modifications executed by Plaintiffs are valid because Plaintiffs held out Mr. Fox as having authority to sign them, and Defendants reasonably relied on that apparent authority. Plaintiffs' change in position, that their properties are not collateral for the 2016 Loan, would be detrimental to Defendants because it would cause them to lose secured status, at least as to the value of Plaintiffs' property. Mr. Neumeyer's testimony that the 2016 Loan would not have been made without Plaintiffs granting their real properties as collateral[63] was not only unchallenged by Plaintiffs but is considered entirely plausible and reasonable by the court.

Plaintiffs themselves created this situation, and it would be unfair, or inequitable, for them to use the defect they created to invalidate the modifications after agreeing that their properties would secure the 2016 Loan. Accordingly, the court finds that Defendants have proven the elements of equitable estoppel by clear and convincing evidence.

### *Debtor-in Possession Status*

Plaintiffs contend that as debtors-in-possession, equitable estoppel cannot prevent them from avoiding the mortgage modifications pursuant to 11 U.S.C. § 544, which allows a trustee or debtor-in-possession to step into the shoes of a hypothetical lien creditor to avoid transfers.[64]

---

[62] Statement of Uncontested Material Facts, Joint Pre-trial Order, P-138, p. 4.

[63] Testimony of Neumeyer, Tr. T. 152:15-22; 153:21 - 156:11.

[64] Section 1107(a) of the Bankruptcy Code gives debtors-in-possession the powers and duties of a trustee.

Initially, the court notes that Plaintiffs' complaint[65] and amended complaint[66] lack any mention of avoidance pursuant to section 544.  Also, this is not a typical case of a debtor-in-possession or trustee using third party status powers under section 544 to avoid a lien that is insufficient or defective under the public records doctrine.[67]  Unlike in that case, Plaintiffs are responsible for the defect in the mortgage modifications and cannot now conveniently use bankruptcy to take advantage of it.  To allow Plaintiffs to do so would be an abuse of the bankruptcy process and the ultimate example of "gotcha" litigation.

## Conclusion

The only way to honor the benefit of the bargain made while avoiding a massive windfall in favor of the parties who were in the best position to make it right is to rule in favor of Defendants.  Accordingly, the court finds in favor of Defendants and against Plaintiffs on all counts.

Specifically, Plaintiffs' mortgage modifications are valid due to the apparent authority of Mr. Fox to execute them.  Defendants reasonably relied on that apparent authority.  Likewise, Plaintiffs are equitably estopped from taking the position that the mortgage modifications are invalid. The court will enter a separate judgment.

Baton Rouge, Louisiana, September 8, 2023.

**s/ Michael A. Crawford**
MICHAEL A. CRAWFORD
UNITED STATES BANKRUPTCY JUDGE

---

[65] Complaint, P-1.

[66] Amended Complaint, P-75.

[67] *See Mustang Gas Products, LLC, v. Wells Fargo, N.A. (In re Alta Mesa Res., Inc.),* No. 19-35133, 2021 WL 2877430, at *4 (Bankr. S.D. Tex. July 8, 2021), *on reconsideration in part,* No. 19-35133, 2023 WL 4139854 (Bankr. S.D. Tex. June 22, 2023); *Stanton v. Texas Drug Co. (In re Stanton),* 254 B.R. 357 (Bankr. E.D. Tex. 2000) (finding that debtor-in-possession was third party who could contest unperfected financing statement).